Eugene **BOICE**, John Di Palermo, and Robert Wahrman, Plaintiffs–Appellees,

v.

**UNISYS CORPORATION,** Defendant–Appellant.

No. 939, Docket 94–7682.

United States Court of Appeals, Second Circuit.

Argued Jan. 31, 1995.

Decided March 23, 1995.

Lawrence B. Pedowitz, New York City (Carol Miller, Wachtell, Lipton, Rosen & Katz, of counsel), for defendant–appellant.

Jean M. Mahserjian, Clifton Park, for plaintiffs–appellees.

Before: MESKILL, McLAUGHLIN, and JACOBS, Circuit Judges.

McLAUGHLIN, Circuit Judge:

On this appeal, we must decide whether a person, who in response to a subpoena turns over documents to a government official, knowing that the documents contain libelous statements, enjoys an immunity from a suit for defamation. If so, is the immunity absolute or qualified?

The district court (Con. G. Cholakis, *Judge*) held that such a person was not absolutely immune from defamation suits arising out of the surrender of documents under a subpoena from the New York State Inspector General. The court concluded that Unisys enjoyed only a qualified privilege and could not avail itself of the absolute privilege because the Inspector General did not act in a judicial or quasi-judicial capacity.

We find that New York has long accorded an absolute privilege from defamation suits to those who produce evidence under compulsion of a governmental subpoena. Thus, we reverse.

## BACKGROUND

On review of this denial of a motion to dismiss, we accept as true all the facts pled in the plaintiffs' complaint.

The plaintiffs, Eugene Boice, John DiPalermo, and Robert Wahrman, were employed by the New York State Department of Social Services. The defendant, Unisys Corporation, is a vendor of computer equipment and it does business with the Department of Social Services.

Between 1988 and 1991, several Unisys employees submitted hundreds of phony expense vouchers to Unisys's accounting department, seeking "reimbursement" for expenses that were never incurred. These unscrupulous employees falsely claimed in the vouchers that they had entertained the plaintiffs on a near daily basis, ostensibly to drum up business.

In September 1992, the New York State Inspector General began an inquiry into the entertainment of state employees. *See* N.Y. State E.O. No. 103 (Oct. 4, 1987) (granting the Inspector General power to investigate fraud, abuse and corruption in state agencies). During the investigation, the Inspector General served a subpoena upon Unisys, requiring that a Unisys official personally appear at a private hearing, and bring with him copies of "all expense reports ... relating to ... entertainment expenses provided to New York State employees from January 1, 1988 to the present." The subpoena contained the usual language that a personal appearance was not necessary if Unisys sent the documents by mail. It warned, however, that failure to comply would make Unisys "liable to the penalties prescribed by law."

Before Unisys produced the documents, a Unisys employee tipped off plaintiff DiPalermo about the subpoena and the falsified vouchers. DiPalermo promptly called Unisys and demanded that it tell the Inspector General that the plaintiffs' names had been falsely placed on the vouchers. Unisys assured DiPalermo that it would send the Inspector General a letter explaining that the vouchers were phony. Despite its promise, Unisys turned the documents over to the Inspector General (in lieu of giving testimo-

ny) without any accompanying explanation. As a result, the Inspector General began investigating the plaintiffs.

The plaintiffs sued Unisys in New York Supreme Court claiming civil rights infringement, intentional infliction of emotional distress, and defamation. On this last claim, the plaintiffs alleged that Unisys libeled them by producing the vouchers knowing that they falsely named plaintiffs. The complaint further alleged that Unisys refused to explain that the vouchers were falsified because it was trying to cover up infractions that Unisys itself had committed.

Unisys removed the action to the United States District Court for the Northern District of New York based on diversity jurisdiction. Unisys then moved to dismiss the entire complaint. Regarding the defamation claim, Unisys asserted that it enjoyed an absolute privilege from suit for defamation arising out of the documents produced to the Inspector General because: (1) the Inspector General's proceeding was quasi-judicial; and (2) the document production was compelled by subpoena.

The district judge granted Unisys's motion in part, and dismissed the civil rights and emotional distress claims. It refused to dismiss the defamation claim, however, ruling that Unisys's privilege not to be sued for defamation was qualified only, and not absolute. The judge found that the absolute privilege was not available because the Inspector General's investigation did not have enough quasi-judicial attributes to prevent abuse of the privilege. In reaching this conclusion, the district judge noted that: (1) the Inspector General has no remedial enforcement powers of his own; and (2) the investigation lacked procedural safeguards such as the right to cross-examine and the ability to appeal determinations of fact. The court did not address Unisys's compelled evidence argument.

## DISCUSSION

### I. *Appellate Jurisdiction*

■ There is a question whether we have jurisdiction to review the district court's interlocutory order. Federal appellate juris-

diction exists over certain important interlocutory orders that regard matters collateral to the claims asserted at trial. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). Thus, we may review an interlocutory order "if it (1) conclusively determines the question presented, (2) resolves an important issue that is completely collateral to the merits, and (3) concerns a right that would be effectively unreviewable after a final judgment on the merits." *In re Pan Am Corp.*, 16 F.3d 513, 515 (2d Cir.1994) (citing *Gulfstream v. Mayacamas Corp.*, 485 U.S. 271, 276, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988)); *see Swint v. Chambers County Comm'n*, — U.S. —, —, 115 S.Ct. 1203, 1208, 131 L.Ed.2d 60 (1995).

■ We find that the denial of a motion to dismiss for absolute privilege is immediately appealable. The absolute privilege assures a citizen that he cannot be sued for defamation on the basis of his response to the subpoena. Indeed, immunity and privilege serve the same purpose: to encourage the possessor to execute his responsibilities fully, without fear of being sued later for civil damages. *Compare Mitchell v. Forsyth*, 472 U.S. 511, 525, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1985) ("[T]he essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action."); *with Briscoe v. La-Hue*, 460 U.S. 325, 333, 103 S.Ct. 1108, 1114, 75 L.Ed.2d 96 (1983) ("A witness's apprehension of subsequent damages liability might induce ... self-censorship.").

Because the immunity is designed to insulate an individual from litigation, an order denying total immunity is conclusive, and meets the first *Gulfstream* prong. The second prong is met because the existence of absolute immunity, a privilege against suit, is entirely separate from the merits of the claim. *See Mitchell*, 472 U.S. at 528–29, 105 S.Ct. at 2816–17 ("[T]he Court has recognized that a question of immunity is separate from the merits of the underlying action for purposes of the *Cohen* test."). And, the third prong is satisfied because the "essence" of the immunity is a right not to go to trial, *see id.* at 525, 105 S.Ct. at 2814, and it would be

toothless if the holder could not obtain interlocutory review. *See generally Digital Equipment Corp. v. Desktop Direct, Inc.,* —— U.S. ——, ——, 114 S.Ct. 1992, 1998, 128 L.Ed.2d 842 (1994) ("A fully litigated case can no more be untried than the law's proverbial bell can be unrung. . . .").

## II. *Absolute Versus Qualified Privilege*

■ Public policy requires that certain communications, though defamatory, are privileged, and may not serve as the basis for a defamation action. *See Park Knoll Assocs. v. Schmidt,* 59 N.Y.2d 205, 208, 464 N.Y.S.2d 424, 451 N.E.2d 182 (1983). Two types of privileges are recognized: qualified and absolute. The difference between the two is relevant only when the party asserting the privilege has acted in bad faith. The holder of a qualified privilege may be sued for defamation if he published the statements with malice. *See Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994); *Stukuls v. State of New York,* 42 N.Y.2d 272, 275, 397 N.Y.S.2d 740, 366 N.E.2d 829 (1977). One who enjoys the absolute privilege, in contrast, may not be sued no matter how malicious his state of mind. *See Park Knoll Assocs.,* 59 N.Y.2d at 208–09, 464 N.Y.S.2d 424, 451 N.E.2d 182.

■ Vintage case law demonstrates that New York bestows an absolute privilege upon those whom the government compels to give evidence. *See, e.g., Hirshfield v. Henley,* 228 N.Y. 346, 349, 127 N.E. 252 (1920) (witness who gives compelled testimony to Commissioner of Accounts enjoys same privileges as one who testifies in court); *McLaughlin v. Charles,* 14 N.Y.S. 608, 610 (3d Dep't 1891) ("The witness testified under compulsion, and he is entitled to the protection that what he says as a witness shall not be a cause of injury to him."); *Newfield v. Copperman,* 42 N.Y.Super.Ct. 302, 305 (1877) (witness compelled by subpoena to make statement to fire marshal was absolutely privileged not to be sued for defamation). *See generally Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.,* 545 F.Supp. 1106, 1116 (S.D.N.Y.1982) (New York confers the absolute privilege upon any witness who testifies before a legislative committee with the power to issue a subpoena).

In *Hirshfield,* for example, the New York Court of Appeals held that a witness subpoenaed by the New York City Commissioner of Accounts must testify, and that he would receive the same privileges accorded to a witness in a judicial proceeding, i.e., absolute immunity. *See* 228 N.Y. at 349, 127 N.E. 252.

In holding that witnesses before the Commissioner enjoy the same protection as those who testify in court, *Hirshfield* relied exclusively on the fact that the Commissioner had the power to compel witnesses to testify and examine them under oath: "Those who are made witnesses in virtue of *those powers* are entitled to *all* the privileges and protection extended by the law to witnesses in judicial proceedings." *Id.* (emphasis added).

Similarly, in *Newfield v. Copperman,* 42 N.Y.Super.Ct. 302 (1877), a fire marshal subpoenaed a witness, and questioned him about the origins of a factory fire. The witness responded with evidence implicating the factory owner. The factory owner sued the witness for defamation, alleging that the witness's accusations were both false and malicious. *See id.* at 304. *Newfield* held that the witness was absolutely immune from the defamation suit because the fire marshal had jurisdiction to make the inquiry, the witness did not initiate the investigation, the testimony was compelled by subpoena, and the witness's responses were material and relevant to the inquiry. *See id.* at 305.

■ We read these cases to establish that, under New York law, a person who discloses information to a government officer or agency enjoys an absolute immunity from a defamation suit based on that disclosure so long as: (1) the disclosure was compelled by subpoena; (2) the disclosure materially responded to the subpoena; and (3) the person did not set the investigation in motion, or otherwise manipulate the investigative process to promote the libel. Such an absolute immunity is conferred regardless of whether the proceeding may be described as quasi-judicial.

■ Here, the Inspector General ordered Unisys, under penalty of law, to produce documents reflecting the entertainment of

state employees from 1988–1992. Unisys turned over pre-existing expense vouchers that clearly responded to the subpoena's description. Unisys did not instigate the Inspector General's investigation, nor did it fabricate the vouchers in order to maneuver the proceedings.

■ The plaintiffs argue that these cases do not bestow absolute immunity upon those who are compelled to publish defamatory material. Citing *Toker v. Pollak*, 44 N.Y.2d 211, 222, 405 N.Y.S.2d 1, 376 N.E.2d 163 (1978), they argue that the only time a witness earns absolute immunity is when he gives evidence at a judicial proceeding, or an administrative proceeding with quasi-judicial trappings. *See* 44 N.Y.2d at 222, 405 N.Y.S.2d 1, 376 N.E.2d 163. As *Toker* explains, proceedings are quasi-judicial if: (1) a hearing is held; (2) both parties may participate; (3) the presiding officer may subpoena witnesses; and (4) the body has the power to take remedial action. *See id.* Because the Inspector General did not conduct an adversarial hearing, and because he does not have the power to take remedial action, the plaintiffs maintain that Unisys is not entitled to the absolute privilege.

We reject this narrow reading of *Toker*. In *Toker*, a defendant called a District Attorney's office to criticize the qualifications of a potential judicial appointee. The appointee sued the defendant for defamation. Noting that a person who *volunteers* statements to a state official, without a hearing, compulsion of subpoena, or any procedural safeguards, cannot avail himself of the "quasi-judicial proceeding" basis for absolute immunity, *Toker* held that the defendant was not absolutely immune. *See id.* at 220–21, 405 N.Y.S.2d 1, 376 N.E.2d 163.

*Toker* explained that absolute immunity would be inappropriate for "communications which because of the absence of a hearing may often go unheard of, let alone challenged, by their subject." *Id.* at 222, 405 N.Y.S.2d 1, 376 N.E.2d 163. Such concerns are absent in this case, however, because the production of documents was not unsolicited. To the contrary, the production was *compelled* by subpoena, the failure to comply with which would have subjected Unisys to

contempt proceedings. Application of *Toker* as plaintiffs suggest would place Unisys in the position of choosing between willful noncompliance with a subpoena, which would subject it to contempt proceedings, and compliance with the subpoena, which would subject it to a defamation suit. We refuse to place Unisys in this Catch 22 dilemma. *Toker* is simply inapposite in a case where a valid subpoena has been issued.

A third course, proposed by plaintiffs, would require a person responding to a subpoena to disavow, disclaim, or correct libelous statements contained in the documents. Such a rule would entail review by counsel (perhaps by a libel lawyer), investigation of events reflected in (possibly voluminous) documents, and fencing with people (such as plaintiffs) who have advance notice that potentially damaging or libelous documents may be produced. The increased costs, obligations and risks associated with such a rule would impede the swift and voluntary compliance that the immunity rule is intended to induce.

We further note that *Hirshfield* bestowed absolute immunity even though the proceeding was far from judicial. The Commissioner in *Hirshfield* was conducting a fact-finding investigation to prepare a report for the Mayor. While he had the power to subpoena witnesses and examine them, the Commissioner had no authority to take remedial action, and he did not examine witnesses at a hearing. *See id.*, 228 N.Y. at 348, 127 N.E. 252; *cf. Tulloch v. Coughlin*, 50 F.3d 114, 116 (2d Cir.1995) (noting that subpoena power and the right to cross-examine witnesses indicate procedural formality weighing in favor of absolute immunity). Here, by contrast, the Inspector General has the power to "subpoena and enforce the attendance of witnesses." 9 N.Y.Codes, Rules & Regs. § 4.103.III.1.(a).

■ Absolute immunity from defamation suits rests on policy reasons that are still sound. If a person gives the government defamatory material under threat of contempt, and has not manipulated the proceedings in any way, he should not be subject to a

suit for damages based on this forced publication, even if he knows the contents are defamatory. *See Restatement (Second) of the Law of Torts* § 588 cmt. a (1977) ("The compulsory attendance of all witnesses in judicial proceedings makes [the absolute privilege] the more necessary."); § 592A ("One who is required by law to publish defamatory matter is absolutely privileged to publish it."); § 592A cmt. b (The § 592A rule is not limited to certain fact patterns but "will apply whenever the one who publishes the matter acts under legal compulsion in so doing.").

## CONCLUSION

"[T]he claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Calkins v. Sumner*, 13 Wis. 193, 197 (1860) (cited in *Briscoe*, 460 U.S. at 333, 103 S.Ct. at 1114.). Accordingly, we reverse the judgment of the district court, and remand with instructions to dismiss.

REVERSED and REMANDED with instructions to dismiss.

MESKILL, Judge, dissenting:

I do not agree that "[v]intage case law demonstrates that New York bestows an absolute privilege upon those whom the government compels to give evidence." Maj. op. at section II. Accordingly, I respectfully dissent.

It is axiomatic that this Court, sitting in diversity, is bound to follow the law of New York. New York courts consistently have held that the dispositive question for absolute immunity purposes is the nature of the proceeding in which the allegedly defamatory statement was made and, contrary to the majority's conclusion, not whether publication of the statement was compelled by subpoena. As the New York Court of Appeals explained in the controlling case, *Toker v. Pollak*, 44 N.Y.2d 211, 219, 405 N.Y.S.2d 1, 4, 376 N.E.2d 163, 166 (1978), the "protective shield [of absolute immunity] has been granted *only* to those individuals participating in a

public function, such as judicial ..., legislative ..., or executive proceedings." (emphasis added, citations omitted). Indeed, case law more vintage than that relied on by the majority makes this abundantly clear. *See, e.g., Moore v. Manufacturers' Nat'l Bank of Troy*, 123 N.Y. 420, 425–26, 25 N.E. 1048, 1049 (1890) ("There is another class of privileged communications where the privilege is absolute.... In this class are included slanderous statements made by parties, counsel or witnesses in the course of judicial proceedings, and also libelous charges in pleadings, affidavits or other papers used in the course of the prosecution or defense of an action."); *Pecue v. West*, 233 N.Y. 316, 321, 135 N.E. 515, 516 (1922) ("We have said impliedly that the rule [of absolute immunity] applies only to a proceeding in court or one before an officer having attributes similar to a court."); *Perkins v. Mitchell*, 31 Barb. 461, 471 (N.Y.Sup.Ct.1860) ("The phrase employed by the judges and the text writers, in speaking of this sort of privileged communications, is 'judicial proceedings.'"); *Hosmer v. Loveland*, 19 Barb. 111, 115–16 (N.Y.Sup.Ct.1854) ("[W]ords spoken or published, which, under ordinary circumstances would be slanderous or libelous, are held to be [absolutely] privileged when spoken or written on, or in connection with, a lawful occasion; that is, in a legal or judicial proceeding, parliamentary debate, applications, petitions, communications.").

New York controlling authority does not confer absolute immunity on a party merely because the production of documents is compelled by a subpoena. *See, e.g., Mancini v. Marine Midland Bank*, 185 A.D.2d 682, 682, 586 N.Y.S.2d 61, 62 (4th Dep't) ("the statements contained in the information subpoena were absolutely privileged because they were made in the course of a judicial proceeding in which plaintiff was a named party and were material and pertinent to the litigation"), *appeal den.*, 80 N.Y.2d 760, 591 N.Y.S.2d 138, 605 N.E.2d 874 (1992). Indeed, the cases relied on by the majority—*Hirshfield v. Henley*, 228 N.Y. 346, 127 N.E. 252 (1920), *McLaughlin v. Charles*, 14 N.Y.S. 608 (3d Dep't 1891), and *Newfield v. Copperman*, 42 N.Y.Super.Ct. 302 (1877)—simply do not stand for the proposition that New York law

recognizes absolute immunity under the circumstances of the case before us. Notably, *Hirshfield*, on which the majority principally relies, Maj. op. at section II, was not even a case involving the question of absolute immunity; rather, *Hirshfield* addressed the propriety of compelling a witness to testify before the Commissioner of Accounts. In any event, these cases serve only to reinforce the proposition that New York courts always have looked to the character of the proceeding in question, cloaking only judicial, legislative or executive proceedings with absolute immunity. *See, e.g., McLaughlin,* 14 N.Y.S. at 609 ("This investigation before the common council was then a *judicial* investigation in the sense that the common council could summon witnesses, administer an oath to them, and punish them for refusing to testify.... Testimony given under such circumstances is absolutely privileged.") (emphasis added, citation omitted); *Newfield,* 47 How. 87, 88 (N.Y.Sup.Ct.) ("The true doctrine is, that words spoken or written, in a *judicial proceeding,* by any person having an interest therein, or a duty to perform therein as witness or counsel, are not only conditionally, but absolutely privileged.") (emphasis added), *aff'd,* 42 N.Y.Super.Ct. 302 (1877).

Finally, Unisys was not presented with as intractable a dilemma as the majority suggests. A qualified privilege will provide the necessary protection to those in Unisys' predicament, as New York law fully recognizes. *See Toker,* 44 N.Y.2d at 219, 405 N.Y.S.2d at 5, 376 N.E.2d at 167 ("A communication is said to be qualifiedly privileged where it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs.") (quotation omitted). Application of *Toker* therefore will not place a party such as "Unisys in the position of choosing between willful noncompliance with a subpoena, which would subject it to contempt proceedings, and compliance with the subpoena, which would subject it to a defamation suit." Maj. op. at section II. Indeed, as the New York Court of Appeals commented when faced with a similar argument in *Toker:*

> The protection afforded by a qualified privilege should not be cavalierly dismissed as inadequate. On the contrary, while not providing an absolute cloak of protection, a qualified privilege does provide an atmosphere in which a civic-minded citizen may, without fear, convey information which he believes the disclosure of which will redound to the benefit of the public. Only those who act out of malice, rather than public interest, need hesitate before speaking. It is in these latter instances that [p]roof of such indirect motive will defeat the privilege which would otherwise have attached, for it is not to the convenience and welfare of society that false and injurious communications as to the reputation of others should be made.

44 N.Y.2d at 221, 405 N.Y.S.2d at 6, 376 N.E.2d at 167 (quotation omitted). More importantly, and perhaps forgotten by the majority, a qualified privilege will better balance the needs of parties confronted with a document subpoena with the rights of those defamed by statements published in such subpoenas, as was alleged here.

Accordingly, I would affirm.